Good morning, and may it please the Court. My name is Dennis Benjamin. I'm here for the petitioner-appellant, Mr. Salato. Good morning. Two minutes, if I may. All right. I'm here today to ask the Court to grant the writ of habeas corpus in this case. The Idaho Court of Appeals unreasonably applied Innis v. Rhode Island as well as Edwards v. Arizona by finding that interrogation did not occur, all in contradiction to the trial court's findings of fact. Now, here, Boise Detective Lance Anderson Well, let me ask you about that. We're reviewing the court of appeal, correct? Yes. All right. And what you're saying is the trial court made certain statements that So are we reviewing the trial court or are we reviewing what the court of appeals does? Well, you review what the court of appeals does, but 2254 requires you also to give deference to the state court findings of fact. Now, in Idaho, as in almost every appellate court that I know of, the appellate court does not make findings of fact. It defers to the findings of fact of the trial court. So it's important to look at what the trial court findings were in order to determine whether or not the Idaho Court of Appeals properly applied the Federal constitutional law to those facts as found by the district court, by the state district court, which we, by Congress's mandate, give deference to. And if that is true, what are the trial judge's findings of fact? Are they his comments at the time he was making, at the time of the hearing, or are they what he wrote in his written decision? Well, I think that the written findings control over the oral findings to the extent that they're inconsistent. But they're not inconsistent, at least in my view. Judge Neville, on page 7, page 11 of the Go through the language on that because some of them I would call might be what you could say are, if I'm going to play the devil's advocate with you, what are musings in terms of, well, the officer may have this or whatever. And then there's other things where the language is, I find. So address that for us when you're going through those two. Well, I think that Judge Neville does not write really tight findings of fact. And, of course, the State was the one who wrote the findings of fact and presented them and was modified in some respects. But, I mean, he does make the findings that are necessary to find interrogation. He does say it is also probably true, finding by a preponderance, probably true that Anderson knew Salato might be ready to confess and that the information might entice him to do so. He also says he finds that Salato's main concern earlier had been not to implicate the others. Had he used find there and the other was probably or may? Is there a difference in the language between those two? Well, probably is a finding by a preponderance. And I think may is probably something less than that. But if you look to the oral findings, he says that it is probably true. And, again, it's true that Detective Anderson knew about this. And then what in the judge's own words skillfully exploited Mr. Salato's vulnerability as so far as not wanting to implicate his co-defendants. Is the skillfully exploited in his formal decision or was that part of his musings at the evidentiary hearing? Well, it was part of his oral findings at the end of the evidentiary hearing. But not part of his formal findings. No, it was not part of his written findings. He says that it is also probably true that Anderson knew Salato might be ready to confess and that the information might entice him to do so. So he does say that Detective Anderson was aware of Mr. Salato's particular vulnerability or susceptibility, to use Rhode Island Viennese's term, to the idea that he didn't want to implicate his co-defendants. With that finding in mind in the undisputed fact that Detective Anderson went back to Mr. Salato for no necessary reason to tell him that his transportation to the jail would be delayed while his co-defendants' confessions were being written out, that is the functional equivalent of interrogation under Rhode Island Viennese. But it doesn't need to have – it doesn't have to be necessary for him to tell him. It just has to be something he says that's normally attendant to arrest and custody. I mean, it's not as if he's limited only to what is required to be said. He said something that related to his custody. We'll be going in a little while because your co-defendants are writing up their statements, and then we'll go. Yes and no. We have to realize in the factual context Detective Anderson has already told Mr. Salato. Mr. Salato asserts his right to counsel. He says, okay, we're going to take you to jail as soon as arrangements can be made. And that's where it's left. He leaves. Then he comes back at least once and maybe twice, according to the state court findings. On the second time or the last time, he says that your transportation is being delayed, which is all attendant to custody and arrest, but goes further and says because your co-defendants are writing their confessions. This case is actually very similar to this court's case in United States v. Padilla, 387 F. 3rd, 1087, which I've cited in my brief. In Padilla, what happened is that Padilla refused to cooperate with federal authorities in locating a fugitive. He happened to be in state prison at the time. And as a result of his failure to cooperate, or subsequent to his failure to cooperate at least, a federal indictment was issued against Mr. Padilla, and the federal law enforcement agents came to pick up Padilla to take him to be arraigned. And they told him that he was being indicted and they were taking him to the courthouse and then went on to say this is your last chance to cooperate. Now, this court found that that last part, your last chance to cooperate, was the functional equivalent of interrogation under Innis. It had no problems with the you've been indicted for a federal firearm case or we're taking you to the federal courthouse in order to be arraigned. That's all normally attendant to arrest and custody. What this court found was that going further, last chance to cooperate was interrogation, and that's precisely what happened here. Mr. Anderson, Detective Anderson, knew that Mr. Slato was going to confess if his co-defendants had confessed. And by feeding him that information, in addition to some other information, that... He could have been right on point with Padilla and said, hey, your co-defendants confessed. This is your last chance to save your, you know, butt. But he didn't. Your Honor, I would prefer to have cases that are exactly on point. Exactly. It doesn't always happen. There's no legal distinction between this case and Padilla's case, and that's why it's an unreasonable application of Innis. I have a minute. Would you like to save the balance of your time? I would. Thank you for your argument. Thank you. May it please the Court, Lamont Anderson for the Respondent, State of Idaho. I know that we raised an issue on the timeliness of the appeal. Based upon what was submitted in the briefing, we are conceding that the appeal was timely. All right. I think that's wise. Yes, Your Honor. Are you familiar with why the Supreme Court decided Miranda? Am I familiar with why the United States Supreme Court decided Miranda? That was my question. Yes, Your Honor, I am. What was the reason? The reason behind Miranda was to prevent coercive situations. No, that wasn't the reason. The reason was because the Supreme Court found as a matter of law, not as a matter of fact, but as a matter of law, that there is a compulsive inherent in custodial surroundings that no statement made by the defendant can truly be the product of his free choice. So it doesn't make any difference what the district court said, what it didn't say in this case, as a matter of fact, a matter of law. The statements made in this case are inherently suspect of coercion. Well, Your Honor, if... That's what the Supreme Court held, said as a matter of law. Your Honor, if a defendant reinitiates statements...  I understand. Compulsive. That's the reason behind Miranda, Your Honor. Inherent. I understand that's the reason behind Miranda, Your Honor, but certainly there's nothing that prevents a defendant from making statements voluntarily to police officers. It is such that the defendant can truly, cannot truly be made the product of his free choice. Your Honor, a defendant can certainly make... He can make all the statements he wants, but the question is, is it the product of his free choice? Well... Isn't that right? I don't think there's any question about that, Your Honor. Certainly it has to be, if you're implying that it wasn't voluntary... Free choice. What does free choice mean? Well, I think that connotes voluntariness, Your Honor. What? It has to be voluntary. Free choice is voluntariness. And I don't think the question before the Court is whether this confession was voluntary. The question, because he was... The district court judge made all kinds of statements indicating that he thought that she thought, whatever it was, that these statements were not the product of free choice. Now, in this case... The file court, yeah. I don't believe there were any statements made that it wasn't the product of free choice. The trial court said that it was the product of free choice based upon the circumstances that were presented at the suppression hearing, Your Honor. I think the most difficult area for me is that is, I think, as your co-counsel stated it, in terms of bringing together what you have, the written findings, and then you have whether are they oral findings, are they musings, you know, what are they? Obviously, I'm sure that if you could go back, you would like to put some cotton in the trial court's mouth there and just say, just make your findings and don't say, you know, don't go, it could be this, it could be that, or whatever. But how do we, you know, how does that factor in? I think counsel for the appellant has articulated his best possible position on that. So what's your best possible position? I think as a whole, there are many things in the oral findings that are nothing more than musings. But more importantly, Your Honors, is the fact that we don't have to worry about the trial court's findings because the only thing we need to worry about is the Idaho Court of Appeals' decision. And the Idaho Court of Appeals affirmed certain findings that were made by the trial court on page, actually, 771 of the Pacific Reporters. It goes through the findings that were actually affirmed. So what you're saying is that, you know, albeit that has, you know, it does bolster what the defendant or the appellant would like us to say, that because this is habeas review, that it's the Idaho Court of Appeals' decision that we have to look to whether it's an unreasonable application of the law or the facts. And tell me as to, I'm assuming that your best argument is that it's not an unreasonable application of INIS. Absolutely. That's the issue before the courts, Your Honor, because he was Mirandized. Detective Anderson stops questioning, goes out, takes care of other witnesses and the co-defendants and takes care of his overstatement. He was a supervising detective. He's finding out what's happening with these other individuals. He comes back, gives nothing more than an update of why this man's not being transported because he's in Detective Anderson's office because there's no other place for him to be housed at that particular moment. Well, that's not comparable to this case. In INIS, the officers were talking to themselves. Here they were talking to the defendant. Oh, there's no question about that. Is that a big difference? It is a difference, Your Honor. It's a significant difference. There's no coercion when they talk between themselves, but when they talk to the defendant and say, your co-counsel, your co-defendant has pled guilty, imply that you want to also. There's no question, but what I'm talking about are the controlling principles of law from INIS in that Miranda was given. Questioning ceased. There was nothing that took place. The rule of law has to apply to the facts of the case. Unquestionably, Your Honor. And INIS are not anywhere near this case. And as far as the facts, you're absolutely right because the officers were talking amongst themselves. But if we look at the circuit cases, and of course this Court can look at the circuit cases in determining whether there was a reasonable application of INIS, we find that there are several cases, even within this circuit, where officers have not just merely been talking amongst themselves, but have went back to the defendant to simply apprise them of what was happening with the investigation. Those are cases not only of habeas review, but of direct appeal, where, of course, there is a significantly different standard than what we have in habeas. Do you consider it at all significant that after he's Mirandized, that's a taped statement. Then when he invokes, the tape comes off. The conversation of whether it's interrogation or what exactly is going on, whether he's updating his co-defendant, of what's happening with the co-defendant, that's not taped. Then it's my understanding of the facts that then the defendant says they play for the defendant, one of his co-defendants, the taped co-defendant. Then they go back on tape when he talks again. Is that right? That is correct, Your Honor. So the conduct that we're really looking at, whether it was an update, whether it was interrogation or whatever, that's not on tape, right? That is not on tape, Your Honor, because Detective Anderson, again, was supervising the investigation, came back, said we're just about ready. And these are minor words. They're not the exact words out of the transcript. But basically that we're almost finished here. We're getting ready to transport you. We're simply waiting for your co-defendants to finish writing their statements. That wasn't on tape. The tape had been turned off. It's then that Solato says, well, I want to hear the co-defendant's statements. I want to hear the tape. And, yes, the tape was then played for him or something was played for him. And it was at that time that he did offer his statements. I have a question that I didn't have a chance to ask Appellant's Counsel, and he may want to respond after you say something on this. Are you familiar with Hayes v. Brown that explains why Brecht is not used when ineffective assistance of counsel claims are being reviewed because Strickland imposes a prejudice analysis? So I'm wondering why Brecht's inapplicability to the IAC claims would have any bearing on this Court's review of trial error because there's some discussion in that about. It's been a while since I read Hayes, Your Honor, but certainly that is the position that the State takes as far as the harmless error standard, and that is that I believe counsel. Well, if we got to that point, would we do the harmless error or would we send it back to the district court to do the harmless error, or what's your position on that? No, Your Honor, you can do the harmless error under both. And, again, it's been a while since I read Hayes, but certainly under Baines you can do the harmless error without sending it back to the federal district court. Well, if we got to that point, what would be your position? If we did harmless error under Baines, what do you believe? What does the evidence show and what's the status of the evidence? There's significant evidence of his guilt, Your Honor. You basically had folks that had identified co-defendants that, while they had not specifically identified him, they had identified the car that he was in. There is a significant amount of evidence of his guilt without that confession. Of course, the standard is substantial and injurious effect or influence upon the jury's verdict, which is a higher standard than the harmless error standard under Chapman. And there's an enormous amount of evidence, particularly with those witnesses, that saw the co-defendants, saw the car, saw the three individuals, the gun that was found that, I'm trying to remember, it did not have his prints on it, but it did, I believe there was evidence supporting the fact that it was his gun. But there is significant evidence, Your Honor. But, again, I don't believe the Court has to get that far because Salado has failed to establish that the Idaho Court of Appeals' decision was an unreasonable, an objectively unreasonable application of innocence. All right. Unless there's further questions from the panel, your time has expired. Thank you. Thank you. Thank you. I'd like to start with footnote 8 of Ennis, which says, any knowledge that the police have concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining the question. And that's really the issue here. Detective Anderson, who is not in any relation to Mr. Anderson here, was – had knowledge of the particular susceptibility. What knowledge of particular susceptibility? That Mr. Salado did not want to point his finger at the co-defendants. That was the main thing he was concerned about. But how does that make him particularly susceptible to confess? That made him particularly susceptible not to confess when he didn't know there was another confession. But how does that make him want to confess his own involvement? The trial court found, and the evidence supports the finding, that Mr. Salado wanted to confess his own requirement, his own complicity. But how did Detective Anderson know that? Well, he knew that because Mr. Salado said, I don't want to point the fingers at anybody. I want to talk to an attorney. So the trial court – Mr. – Detective Anderson knew, and the trial court found that he had that particular susceptibility. Your Honor, with my five seconds left, I'd like to turn to the question that you asked Mr. Anderson and ask for a response from me. All right. Take a minute to do that. The case that you cite I haven't read maybe ever because it's not coming up to me. But I can tell you this. The fact that Brecht does not apply in Strickland cases I think supports my argument that Brecht is not an applicable standard of review or harmless error test in cases where the state court has never applied the correct harmless error. Now, I think it's at least arguable that the prejudice standard of Strickland is higher than the standard in Brecht. And that would be one reason why you would want to apply Strickland rather than Brecht in effective assistance of counsel cases. But that can't be the reason why we use the Strickland case, even in habeas cases, because the Supreme Court has consistently applied the Brady standard in Brady claims that come up on habeas. They've used the does it undermine the confidence in the jury's verdict standard, materiality standard, instead of using the Brecht standard. And I would see the Brady standard as being a lower standard of review than the Brecht substantial and injurious effect. So we have the Supreme Court applying their own standards, Strickland and Brady, even in cases where if it were true that Brecht applied in every habeas case, they would have to apply Brecht on top of that. So I think that's why in cases where the state court has never applied the correct harmless error test, why you need to apply the Chapman test, and that's why this Court in veins said that you could actually remand to the state court for the proper harmless error analysis. All right. Thank you. Your time has expired. Thank you both for your excellent argument. This matter will now stand submitted.
judges: Ferguson, Callahan, Bolton